IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STEPHEN GILMORE, et al., :
    Plaintiffs : No. 4:17-cv-01781
     :
v. : (Judge Kane)
     :
NEIL R. HOLLAND, M.D., et al., :
    Defendants :

**MEMORANDUM**

Before the Court is Defendants Neil R. Holland, Randle H. Storm, Geisinger Medical Center, and Geisinger Clinic, d/b/a Geisinger Medical Group ("Defendants")'s motion to dismiss Plaintiffs Stephen Gilmore and Karen Gilmore ("Plaintiffs")'s complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 17.) For the reasons that follow, the Court will grant the motion.

**I.    BACKGROUND**

    **A.    Factual Background[1]**

Plaintiffs initiated the above-captioned action by filing a complaint against Defendants in this Court on October 2, 2017.[2] (Doc. No. 1) Plaintiffs' allegations stem from a series of incidents that took place between October 7, 2015 and October 9, 2015 at Geisinger Medical Center ("Geisinger"), in Danville, Pennsylvania. (Id. ¶¶ 18-77.) On October 7, 2015, Plaintiff Stephen Gilmore ("Gilmore"), was admitted to Geisinger "for an invasive cardiac procedure called an ablation to treat [his] atrial fibrillation," and the procedure was performed on the same date by Defendant Randle Storm ("Storm"), a physician employed by Geisinger and specializing

---

[1] The relevant facts are taken from Plaintiffs' complaint. (Doc. No. 1.) The Court limits its discussion of the factual background of this case only to those factual allegations relevant for purposes of deciding the motion presently before the Court.
[2] In addition to identifying the Defendants listed supra, the complaint names as Defendants "John Does 1-10," "Jane Does 1-10," and "ABC Corporations 1-10." (Id.)

1

in cardiology. (Id. ¶¶ 7, 18-19.) Gilmore, whose medical history includes atrial fibrillation, took anticoagulation medication and was therefore "known to be at increased [risk] for all types of bleeding and hemorrhage." (Id. ¶¶ 16-17.)

Gilmore experienced numerous medical complications following the ablation procedure. (Id. ¶¶ 20-77.) He "developed urinary retention," and beginning on October 7, he experienced continuous, sharp, and worsening pain in his upper back, as well as increased creatinine levels "evidencing acute renal injury/failure." (Id. ¶¶ 20-22.) On October 8, Gilmore began to experience "severe acute hypertension," and also "complained that his legs were 'heavy' and that he had lower extremity weakness and that he was not able to feel his legs." (Id. ¶¶ 23-24.) That afternoon, Gilmore underwent a "nephrology consult . . . for acute kidney failure overnight and severe back pain," and "was seen by nephrology at 2:48 [p.m.], at which time no gross motor/sensory deficits were noted." (Id. ¶¶ 25-26.) Gilmore was then seen by a fellow in the vascular surgery department for a "vascular surgery consult," and overnight he experienced "worsening lower and upper back pain and now had 'left upper back/below the shoulder pain which is sharp, continuous, [and] non-radiating,'" as well as an increase in his levels of creatinine. (Id. ¶¶ 30, 32.) In addition, "[t]he vascular consult also noted that [Gilmore] had been unable to urinate since [the previous day] and was anuric," and that he "was moving all extremities with normal strength." (Id. ¶¶ 33-34.) The consult further noted "that pain from the urinary retention 'does not, however, explain [Gilmore's] upper back pain.'"[3] (Id. ¶ 36.)

On the evening of October 8, Gilmore underwent a neurology consult at the request of the cardiology department, and "[t]he reason for the neurology consultation was noted to include 'AF on Coumadin,' 'cervicalgia,' and 'worsening back pain and urinary retention . . . [as well as]

---

[3] Further, "[t]he vascular surgery consult requested a STAT renal duplex scan and strongly recommended a transesophageal echocardiogram (TEE) to evaluate for dissection." (Id. ¶ 37.)

2

progressive weakness of left lower extremity over the course of the afternoon." (Id. ¶¶ 40, 42-43.) In addition, "there were also reports, presumably by nursing, that there was more weakness in [Gilmore's] lower extremities and possibly upper extremities" on October 8. (Id. ¶ 44.) The neurology consultation "noted a chief complaint of 'weakness' . . . [and] that there was charting of heaviness and weakness in the left leg at 5:33 [p.m.], but it is unclear when strength was last normal despite vascular note indicating normal strength at 4:03 [p.m.]." (Id. ¶¶ 47-48.) Moreover, the consult indicated "a maximum systolic blood pressure of 225 in the last 24 hours," decreased muscle strength in both the lower and upper extremities, and "markedly diminished reflexes, which constitutes lower extremity paralysis." (Id. ¶¶ 49-50.) The consult further stated that "[w]ith current symptoms, back pain, and recent procedure there may be some concern for spinal cord infarction due to procedure, abscess, or dissection," and Defendant Holland ("Holland"), "specifically noted in the neurology consult that he was 'obviously very concerned about a spinal cord process, such as a hematoma.'" (Id. ¶¶ 54-55.) The neurology consult recommended an MRI of Gilmore's spine. (Id. ¶ 56.)

After Gilmore underwent a spinal MRI in the early morning on October 9, a neurosurgery consult was ordered "for lower extremity weakness and cervical/thoracic abnormality on [the] MRI," and Gilmore "was in the MRI scanner at the time of the neurosurgery consultation and was seen by neurosurgery at the conclusion of the MRI." (Id. ¶¶ 59-60.) The consultation "interpreted the MRI as demonstrating an epidural hematoma," and "recommended, inter alia, holding the [C]oumadin and aspirin, obtaining a STAT INR, and reversing the anticoagulation to less than 1.4, and that surgery was required as soon as the INR permitted and that the operating room was aware." (Id. ¶¶ 63, 65.) Subsequently, Dr. Shelly Timmons ("Timmons"), reviewed the MRI that was completed on October 9 and remarked: "[g]iven his examination for several

3

hours, and urinary retention [for two] days, not clear that even with surgery we will be able to effect much improvement in examination; however, we will need to take him emergently to the OR to decompress the cord via laminectomies at C7-T1." (Id. ¶¶ 70-71.) Timmons also stated, "[w]e will go to OR as soon as we can to get him corrected and have access to OR although at this point, prognosis for neurological recover is guarded." (Id. ¶ 72.) Gilmore was then taken "to the operating room for laminectomies for a C7-T2 subarachnoid hemorrhage and spinal cord compression." (Id. ¶ 73.) The surgery revealed "significant spinal cord compression [resulting] from intradural, subdural, and subarachnoid hemorrhage[,] . . . evidence of clotted subarachnoid hemorrhage[,]" and "active bleeding into the compressed hematoma area." (Id. ¶¶ 73-76.)

On October 15, Gilmore left Geisinger and was transferred to Health South Rehabilitation in Pleasant Gap, Pennsylvania, before being readmitted to Geisinger "for altered mental status on October 19." (Id. ¶¶ 78-79.) While at Geisinger, Gilmore "was noted to have respiratory failure, deep vein thrombosis and pulmonary embolism requiring placement of an IVC filter, cardiogenic shock[,] and acute coronary syndrome." (Id. ¶ 80.) Gilmore was discharged from Geisinger on November 3 and moved to a rehabilitation facility. (Id. ¶ 81.)

Since leaving Geisinger, Gilmore has been hospitalized multiple times and requires ongoing "nursing home and rehabilitative care." (Id. ¶ 82.) Further, he "remains paralyzed with severe neurological deficits after his surgery" and "has never been able to return home, as he requires ongoing care." (Id. ¶¶ 83-85.) Gilmore's reported injuries are numerous, and include, inter alia: lower extremity paralysis, paraplegia, permanent spinal cord injury, neurological injury to all four extremities and other body parts (including loss of sensation, movement, weakness, and/or paresthesias), loss of function of the lower extremities, weakness and loss of

4

function in the upper extremity or extremities, as well as hematomas and hemorrhages.[4] (Id. ¶ 86.)

Plaintiffs' complaint sets forth a claim against Geisinger pursuant to the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"), on the grounds that: based on the neurology evaluation conducted at Geisinger, Gilmore "had new lower extremity paralysis and has a new 'emergency medical condition,'" for purposes of EMTALA; "[t]he physicians and hospital staff providing care to [Gilmore] . . . had actual knowledge of [his] new 'emergency medical condition'"; when his medical condition was identified, Gilmore "had 'come to the hospital' and was an inpatient at [Geisinger], consistent with [EMTALA]"; and at the time the condition was identified, Geisinger "had an obligation to provide . . . for such further medical examination and such treatment" as may have been required to stabilize Gilmore's condition under EMTALA. (Id. ¶¶ 51-53, 57.)

### B. Procedural Background

On October 2, 2017, Plaintiffs initiated this action against Defendants by filing a complaint asserting ten (10) counts.[5] (Doc. No. 1 at 21-42.) Counts I and II assert professional negligence claims against Holland and Storm, respectively, while Count III sets forth a corporate negligence claim against Geisinger. (Id. at 21-34.) Counts IV, V, VI, and VII assert vicarious liability claims against Holland, Storm, Geisinger, and Geisinger Clinic, respectively. (Id. at 34-37.) Count IX sets forth a claim for loss of consortium against all Defendants. (Id. at 38.)

---

[4] Gilmore's injuries are explained more fully in Paragraph 86 of the complaint. (Id. ¶ 86.)
[5] On December 4, 2017, Plaintiffs filed a stipulation dismissing all claims without prejudice against Defendant Geisinger Health System Foundation, d/b/a Geisinger Health System, on the basis that Geisinger Health System Foundation was not involved in Gilmore's medical care or the employment of any of the physicians named as Defendants in this action. (Doc. No. 21 at 2-3.) The Court approved the stipulation on December 6, 2017. (Doc. No. 23.) Accordingly, because Count VIII of the complaint set forth a vicarious liability claim against only Geisinger Health System Foundation, Count VIII has been dismissed.

Count X sets forth a claim against Geisinger for a violation of EMTALA (id. at 39), and Count XI asserts a claim for negligent infliction of emotional distress against all Defendants (id. at 41).

On December 4, 2017, Defendants filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. No. 17), as well as a brief in support (Doc. No. 18).[6] Plaintiffs filed a brief in opposition to Defendants' motion (Doc. No. 26), and Defendants subsequently filed a reply brief (Doc. No. 27). Accordingly, the motion has been fully briefed and is now ripe for disposition.

## II. LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests. Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief. Fed. R. Civ. P. 8(a). Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted." See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010). The Court's inquiry is guided by the standards of Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Under Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of pleading." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). To avoid dismissal, all civil

---

[6] On December 4, 2017, Defendants Neil R. Holland, Geisinger Medical Center, and Geisinger Clinic filed notices of joinder in the motion to dismiss. (Doc. Nos. 19, 20.)

complaints must set out "sufficient factual matter" to show that the claim is facially plausible. Id. The plausibility standard requires more than a mere possibility that the Defendant is liable for the alleged misconduct. As the Supreme Court instructed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the United States Court of Appeals for the Third Circuit has identified the following steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). A court may also consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (internal quotation marks omitted)

7

(quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).

## III. DISCUSSION

Plaintiffs appear to assert a stabilization claim against Geisinger under EMTALA on the basis that Gilmore's medical treatment at Geisinger was governed by EMTALA, and that Geisinger failed to stabilize Gilmore and/or transfer him to another medical facility for further treatment, as required under EMTALA. (Doc. No. 1 ¶¶ 111-19.)

Defendants move to dismiss the complaint on the basis that Plaintiffs have failed to state a claim under EMTALA and the Court therefore lacks subject matter jurisdiction over Plaintiffs' remaining state law claims. (Doc. No. 18 at 5.) Defendants also assert that, even if this Court were to find that Plaintiffs adequately pled an EMTALA claim and exercised supplemental jurisdiction over Plaintiffs' state law claims, Plaintiffs' claim for negligent infliction of emotional distress should be dismissed because Plaintiffs have failed to state a claim upon which relief may be granted. (Id.) As discussed below, the Court will dismiss the complaint in its entirety because it fails to state a claim under EMTALA, and, therefore, the Court does not have subject matter jurisdiction over the remaining state law claims.[7] Accordingly, the Court will address only Plaintiff's EMTALA claim.

### A. EMTALA

#### 1. Statutory Text and Regulations

---

[7] Because Plaintiffs' EMTALA claim provides the only basis for this Court to exercise jurisdiction over this action pursuant to 28 U.S.C. § 1331, and a lack of diversity between the parties negates the possibility of this Court exercising jurisdiction under 28 U.S.C. § 1332, the Court would have supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 only if it were to deny the motion to dismiss and permit Plaintiffs' EMTALA claim to proceed. However, because the Court will dismiss Plaintiffs' EMTALA claim, no basis exists for this Court to exercise subject matter jurisdiction over Plaintiffs' remaining state law claims.

8

EMTALA mandates that covered healthcare facilities with emergency departments provide a certain level of emergency medical treatment to any individual with "an emergency medical condition."[8] 42 U.S.C. § 1395dd(b)(1). In relevant part, EMTALA mandates that:

> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either –
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

Id. § 1395dd(b)(1). EMTALA imposes multiple obligations on hospitals: "(a) appropriate medical screening, (b) stabilization of known emergency medical conditions and labor, and (c) restrictions on transfer of unstabilized individuals to outside hospital facilities." Baney v. Fick, Civ. No. 14-2393, 2015 WL 758309, at *4 (M.D. Pa. Feb. 23, 2015) (quoting Torretti v. Main Line Hosps., Inc., 580 F.3d 168, 172-73 (3d Cir. 2009)).

In regard to EMTALA's requirement that a hospital stabilize an individual with an emergency medical condition, the associated regulations provide guidance as to how to interpret EMTALA's stabilization requirement. Specifically, "[t]he Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS) promulgated a Federal Regulation, 42 C.F.R. § 489.24(a)-(b), and Final Rule, 68 F.R. 53,222 (Sept. 9, 2003), clarifying the reach of EMTALA." Torretti, 580 F.3d at 174 (footnotes omitted) (citing Brian Kamoie, EMTALA: Dedicating an Emergency Department Near You, 37 J. HEALTH L. 41, 55-56 (2004)). The regulations provide that a hospital's obligations under the statute begin when an individual

---

[8] EMTALA applies to "[h]ospitals that voluntarily participate in the Medicare or Medicaid programs and have effective provider agreements." Torretti v. Main Line Hosps., Inc., 580 F.3d 168, 173 n.8 (3d Cir. 2009) (citing In re. Univ. Med. Ctr., 973 F.2d 1065, 1083 (3d Cir. 1992)).

9

"comes to the emergency department." See 42 C.F.R. § 489.24(a)(1)(2013); see also Torretti, 580 F.3d at 175.

Because EMTALA is interpreted as applying to individuals who "come[] to the emergency department," the CMS regulations recognize an exception to EMTALA for certain inpatient treatment.[9] 42 C.F.R. § 489.24(d) (2013). The exception for inpatients reads as follows:

> (i) If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.
>
> (ii) This section is not applicable to an inpatient who was admitted for elective (nonemergency) diagnosis or treatment . . . .

Id. § 489.24(d). Moreover, the relevant Final Rule states that "existing hospital [conditions of participation] provide adequate, and in some cases, superior protection to patients," and therefore, CMS "interpret[s] hospital obligations under EMTALA as ending once the individuals are admitted to the hospital inpatient care." 68 Fed. Reg. 53,245 (Sept. 9, 2003) (to be codified at 48 C.F.R. pt. 489).

2. **Case Law**

Courts have interpreted EMTALA as a statute intended, inter alia, to prevent "patient dumping," which occurs when hospitals "refus[e] to treat individuals with emergency conditions." See Torretti, 580 F.3d at 169. This Court is guided by Torretti, in which the United

---

[9] The Final Rule has been deemed instructive in examining the applicability of EMTALA. See Torretti, 580 F.3d at 174 ("In analyzing an EMTALA claim, the Act does not stand alone. The Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS) promulgated a . . . Final Rule, 68 F.R. 53, 222 (Sept. 9, 2003), clarifying the reach of EMTALA." (footnotes omitted) (citing Brian Kamoie, EMTALA: Dedicating an Emergency Department Near You, 37 J. HEALTH L. 41, 55-56 (2004)).

10

States Court of Appeals for the Third Circuit first examined the scope of EMTALA's application,[10] and held that "[a]lthough Congress was concerned that the indigent and uninsured tended to be the primary victims of patient dumping, EMTALA is not limited to those individuals." Id. at 173 (citing 42 U.S.C. § 1395dd; Roberts v. Galen of Va., Inc., 525 U.S. 249, 252 (1999)). In Torretti, which concerned the applicability of EMTALA to an individual's outpatient treatment, the plaintiffs' son "was born with severe brain damage after Mrs. Torretti's high-risk pregnancy went awry." Id. at 169. Specifically, Torretti gave birth after she "went to her routine outpatient fetal monitoring appointment at a perinatal facility" that morning, and "[t]he attending medical personnel at the facility directed her to her primary hospital for extended perinatal monitoring." Id. The Torrettis filed suit against the relevant hospitals and doctors under EMTALA and also asserted various state law claims. Id. The Court of Appeals articulated the elements of a "stabilization claim" under EMTALA: (1) that the plaintiff "had an emergency medical condition"; (2) that "the hospital actually knew of that condition"; and (3) that "the patient was not stabilized before being transferred." Id. at 178.

In reasoning that the plaintiffs failed to state a claim under EMTALA because the statute did not apply to outpatients, the Third Circuit looked to the CMS interpretation:

> [W]e believe CMS's more restrictive interpretation on this issue is consistent with EMTALA, and is in accord with the Act's intent. Congress passed EMTALA to curb the problem of patient dumping by creating a statutory duty for hospitals to examine and treat individuals who come to them for emergency care. 42 U.S.C. § 1395dd. Accordingly, this interpretation is entitled to Chevron deference.

Id. at 177 (citing Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843 (1984); Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 504 (1982)).

---

[10] See id. at 169 ("This is our first opportunity to confront the Emergency Medical Treatment and Active Labor Act . . . .").

Additionally, viewing the CMS interpretation instructive, the court applied the regulation to the facts surrounding the plaintiffs' EMTALA claim as follows:

> CMS has the congressional authority to promulgate rules and regulations interpreting and implementing Medicare-related statutes such as EMTALA. Among the 2003 clarifications, the Regulation and Final Rule address where and when EMTALA applies. CMS solicited public comments and took into account a range of objections to the proposed Regulation, providing a lengthy discussion responding to the comments and its reasons for its interpretation in the Final Rule. The Regulation was not raised by the parties or the District Court. Nevertheless, it is instructive to answer the question before us: whether [Torretti] fits within EMTALA's scope –a patient antidumping statute. CMS has concluded that EMTALA does not apply to patients (and outpatients), which interpretation precludes the [plaintiffs'] EMTALA claim in the first instance because [Torretti] was an outpatient who came to [the hospital facility] for a scheduled appointment.

Id. at 174 (citations omitted). Further, the court viewed the Final Rule as demonstrating "the nonapplicability of EMTALA to an individual who has begun to receive outpatient services at an encounter at the hospital other than an encounter that the hospital is obligated by EMTALA to provide." Id. at 176. Accordingly, the Third Circuit rejected the plaintiffs' arguments that EMTALA was triggered by Torretti's presentation to the hospital facility, stating that "it is clear that Congress did not intend [for] EMTALA to cover [such] individuals every time they come to the hospital for their appointments, even though they suffer from serious medical conditions that risk becoming emergent."[11] Id. at 177.

---

[11] The Third Circuit also noted that a Ninth Circuit decision cited by the appellants, Arrington v. Wong, was inapposite in light of the CMS Final Rule regarding the applicability of EMTALA to outpatients. Torretti, 580 F.3d at 177 (citing Arrington v. Wong, 237 F.3d 1066, 1071-72 (9th Cir. 2001)). The Torretti court explained that "Arrington was issued prior to the 2003 Final Rule and revised Regulation that clarified the treatment of outpatients under the statute by revising the definition of 'patient,' which is the significant issue here," and noted that the Arrington court had relied on the previous version of the rule. Id. Additionally, in upholding the district court's grant of summary judgment for the hospital, the court in Torretti recognized that the appellants "will have to pursue legal avenues other than EMTALA because the statute does not apply here," and that "claims of negligence or malpractice more accurately reflect the relief [sought]." Id. at 178.

12

District Courts within this Circuit have also applied Torretti in analyzing the applicability of EMTALA to various actions. In Baney v. Fick, the court held that EMTALA did not apply to a suit brought by a plaintiff who underwent an "elective inpatient spinal procedure" when there was "no allegation that the elective inpatient spinal procedure . . . was to treat an emergent condition or that he presented as an emergency when he appeared for his pre-scheduled appointment." Baney v. Fick, Civ. No. 14-2393, 2015 WL 758309, at *5 (M.D. Pa. Feb. 23, 2015). Baney suffered injuries after his esophagus was perforated during an elective neurosurgical procedure on his cervical spine and argued, inter alia, that he was neither stabilized nor transferred in accordance with EMTALA. Id. at *2. The court analyzed the applicability of EMTALA to Baney's claim as follows:

> Based on Torretti, the court finds that Mr. Baney does not "fit within EMTALA's scope – a patient antidumping statute." There is no allegation that the elective inpatient spinal procedure Mr. Baney was scheduled to have . . . was to treat an emergent condition or that he presented as an emergency when he appeared for his pre-scheduled appointment. Rather, Mr. Baney was being given an elective inpatient surgical procedure at a scheduled appointment at [the hospital facility] and during this procedure a complication occurred, allegedly caused by negligence, when he experienced an esophageal laceration. As such, Mr. Baney was already a patient of [the hospital facility] at the time of his emergency medical condition and he simply cannot be considered as going to [the hospital facility] for purposes of EMTALA. . . . Even if Mr. [Baney] suffered from a serious medical condition that was at risk to become emergent when he presented at [the hospital facility], the EMTALA did not cover him . . . . As the Torretti [c]ourt pointed out, "Congress passed EMTALA to curb the problem of patient dumping by creating a statutory duty for hospitals to examine and treat individuals who come to them for emergency care."
>
> Thus, Mr. Baney's alleged "emergency condition" was really a complication of the elective surgical procedure he was undergoing. Even if the esophageal laceration became a medical emergency during the elective procedure as plaintiffs allege, there is no allegation that Mr. Baney presented a medical emergency on July 19, 2012, when he arrived for his procedure or that he was transferred from [the hospital facility] without having been stabilized when he had an emergency medical condition, i.e., when the laceration occurred as the procedure was being performed. The court finds plaintiffs' reading of EMTALA to be incorrect as applied to the facts of their case and unsupported by case law.

13

Id. at *5-6 (citations omitted).

B. **Arguments of the Parties**

1. **Defendants' Arguments in Favor of Dismissal**

In support of their motion to dismiss, Defendants assert that Plaintiffs have failed to state a claim under EMTALA because "EMTALA was passed by Congress 'to curb the problem of patient dumping' – not 'emergency conditions' that arise as a 'complication of [an] elective surgical procedure.'" (Doc. No. 18 at 8) (alteration in original) (citing Baney, 2015 WL 758309, at *10). Defendants compare Gilmore's claim to that which was rejected by the Baney court:

> In this matter, just as in the Baney case, Plaintiffs do not allege that the elective, inpatient cardiac ablation procedure Mr. Gilmore was scheduled to have on October 7, 2015, was for the purpose of treating an emergency condition, or that he presented with an emergency condition when he appeared for his pre-scheduled appointment. To the contrary, practically identical to the insufficient allegations rejected by this [c]ourt in the Baney matter, Plaintiff's [c]omplaint alleges that Mr. Gilmore's "emergency condition" was a surgical complication arising while an inpatient at GMC. It is further alleged that he remained an inpatient at GMC where he received substantial medical treatment during the week after his purported "new, 'emergency condition'" had been discovered. This included an MRI, neurosurgical consultation, and spinal surgery before he was transferred to an inpatient facility for additional treatment. This is therefore clearly not a case of patient-dumping, and this [c]ourt should dismiss Plaintiffs' EMTALA claim as it dismissed the EMTALA claim in the Baney case under [] substantially similar facts.

(Id. at 10.) Additionally, Defendants maintain that "amendment of Plaintiffs' stabilization claim would be futile" because: (1) Gilmore was an inpatient at the time his emergency condition occurred and "EMTALA simply does not apply under the facts of this case" (id.) (citing Baney, 2015 WL 758309, at *7), and (2) "plaintiffs are federalizing a state malpractice action," which is a "misuse of EMTALA" because EMTALA "does not create a federal cause of action for malpractice" (id.) (citing Torretti, 580 F.3d at 173-74).

2. **Plaintiffs' Arguments Against Dismissal**

Plaintiffs set forth numerous assertions in opposition to Defendants' motion to dismiss.[12] Plaintiffs argue primarily that this Court should not look to the CMS interpretation of EMTALA's stabilization provision with regard to inpatients. (Doc. No. 26 at 13.) Plaintiffs maintain that this view is supported by the plain language of EMTALA, and that "[t]hese unambiguous statutory 'distinct obligations' apply to two (2) different classes of individuals, i.e., one class that 'comes to the emergency department,' and one that 'comes to a hospital,'" and that the regulation "ignored" this distinction "when it interpreted the statutory language 'comes to the hospital' as excluding inpatients who, in fact, come to the hospital other than through the emergency department." (Id.) According to Plaintiffs, "[t]herefore, the [r]egulation directly conflicts with the plain and unambiguous meaning of the statute." (Id.) Plaintiffs point to previous decisions in which courts have declined to defer to the regulation when interpreting the applicability of EMTALA.[13] Further, they refer to additional case law outside the Third Circuit

---

[12] Local Rule 7.8(b) provides that "[u]nless the requirements of Local Rule 7.8(b)(2) and (3) are met, no brief shall exceed fifteen (15) pages in length." L.R. 7.8(b). Further, "[a] brief may exceed fifteen (15) pages so long as it does not exceed 5,000 words," and "[i]f a brief is filed in accordance with this subsection, counsel . . . must include a certificate . . . that the brief complies with the word-count limit described in this subsection." L.R. 7.8(b)(2). Additionally, "[n]o brief exceeding the limits described in this rule may be filed without prior authorization." L.R. 7.8(3). Plaintiffs' brief in opposition to Defendants' motion, which is approximately thirty-two (32) pages in length, exceeds the applicable page limit under Rule 7.8(b)(1) and does not provide a certification that the brief is in compliance with the word-count limitation set forth in Section 7.8(b)(2). Moreover, a review of the docket reveals that Plaintiffs did not seek authorization from the Court to exceed the page limit before filing their brief. However, because the Court finds that Plaintiffs' EMTALA claim is subject to dismissal regardless of the length of Plaintiffs' brief, the Court will not strike Plaintiffs' brief in opposition for failure to comply with the Local Rules.

[13] Plaintiffs cite Moses v. Providence Hospital, in which the Court of Appeals for the Sixth Circuit declined to afford Chevron deference to the CMS interpretation of EMTALA's language regarding the stabilization requirement on the basis that it was "contrary to the plain language of the statute." See Moses v. Providence Hosp., 561 F.3d 573, 583 (6th Cir. 2009). However, the reasonableness of the CMS interpretation of EMTALA was immaterial to the Sixth Circuit's ultimate conclusion, as the court concluded that "[e]ven if the CMS regulation could somehow be deemed consistent with the statute, its promulgation in 2003, after [the patient's] stay in the

that indicates an acceptance of a more expansive view of EMTALA's application, as opposed to a more restrictive view as set forth in the CMS interpretation.[14]

Additionally, Plaintiffs argue that Baney is inapposite because the holding in Baney was incorrect in that it did not address: "the multiple cases relied upon by plaintiffs that stood in direct opposition to [the district court's] decision;" the "clear overriding of the EMTALA statute by the DHS/CMS regulation;" or "a case directly on point for the particular facts of the Baney case, to wit, Reynolds v. Mercy Hospital, 861 F. Supp. 214 (W.D.N.Y. 1994)."[15] (Id. at 24-25.)

C.   **Plaintiffs' EMTALA Claim**

Considering the regulatory framework regarding EMTALA's applicability to inpatients and the reasoning of the Court of Appeals in Torretti, the Court concludes that Plaintiffs have failed to state a claim against Geisinger under EMTALA.

As noted by the Court of Appeals in Torretti, Congress explicitly granted CMS the "authority to promulgate rules and regulations interpreting and implementing . . . EMTALA." Torretti, 580 F.3d at 174 (citing 42 U.S.C. §§ 1302; 1395hh; 5 U.S.C. § 551, et seq.). Therefore, deferral to the regulatory interpretation is proper "[w]here Congress expressly delegates to an agency the power to construe a statute." See id. Although Gilmore's claim raises the issue of

---

hospital ended, would preclude [the] [c]ourt from applying it to this case." See id. at 583-84 (recognizing "presumption against retroactivity" and stating that "[t]he CMS regulation therefore does not apply to this case, regardless of whether its interpretation of the statute is reasonable").
[14] For example, Plaintiffs point to Lopez-Soto v. Hawayek, a decision from the Court of Appeals for the First Circuit, in which the Court of Appeals held that EMTALA's provisions including the language "comes to a hospital" and "comes to the emergency department" should be read disjunctively so as to avoid rendering a portion of the statutory text meaningless. See Lopez-Soto v. Hawayek, 175 F.3d 170, 173 (1st Cir. 1999).
[15] In arguing that Baney was wrongly decided because the district court should have looked to Reynolds, Plaintiffs highlight a statement from the Reynolds court that to interpret the relevant EMTALA provision so as "to refer exclusively to admissions via an emergency room would render the phrase '[i]f any individual comes to a hospital' surplusage, in violation of prevailing standards of statutory construction." (Doc. No. 26 at 26) (citing Reynolds v. Mercy Hosp., 861 F. Supp. 214, 217 (W.D. N.Y. 1999)).

whether EMTALA applies to his inpatient treatment, rather than the issue of applying EMTALA to outpatients that was examined in Torretti, the CMS interpretation of EMTALA is nonetheless "instructive to answer the question before [the Court]: whether [Gilmore] fits within EMTALA's scope – a patient antidumping statute." See id. As explained supra, EMTALA does not apply to "patients," as its "requirements are triggered when an 'individual comes to the emergency department.'" See id. at 175 (citing 42 C.F.R. § 489.24(a)(1)). Moreover, CMS explicitly stated that EMTALA should be interpreted as not applying to inpatients. See 42 C.F.R. § 489.24(d)(2) ("This section is not applicable to an inpatient who was admitted for elective (nonemergency) diagnosis or treatment."). Considering the weight afforded to the applicable CMS interpretation by the Court of Appeals in Torretti, this Court is equally inclined to view the CMS interpretation pertaining to EMTALA's application to inpatients as instructive. Accordingly, because Geisinger's obligations under EMTALA ended when Gilmore was "admitted to . . . inpatient care," Gilmore's medical treatment does not fall within the scope of EMTALA. See 68 Fed. Reg. 53,245.

In addition, the Torretti court stated that the plaintiff's condition was not emergent for purposes of EMTALA because "Torretti came to [the hospital] for her scheduled bi-weekly appointment involving routine monitoring of her high-risk pregnancy and did not present as an emergency to [the hospital] medical staff." Torretti, 580 F.3d at 176. Similarly, Gilmore presented to Geisinger for a cardiac ablation, a prescheduled procedure (Doc. No. 1 ¶ 18), and began to experience neurological issues only after the pre-scheduled procedure had been performed (id. ¶¶ 20-24). Such circumstances do not trigger EMTALA's application, as "Congress did not intend [for] EMTALA to cover [such] individuals every time they come to the hospital for their appointments, even though they suffer from serious medical conditions that risk

17

becoming emergent." See Torretti, 580 F.3d at 177. Accordingly, Gilmore's treatment at Geisinger is not governed by EMTALA.

Furthermore, additional case law weighs against adopting Plaintiffs' view that EMTALA applies in the instant case. As an initial matter, the district court in Baney, while applying Torretti, declined to apply EMTALA to a claim when a patient underwent "an elective inpatient surgical procedure at a scheduled appointment . . . and during this procedure a complication occurred." See Baney, 2015 WL 758309, at *5 (stating that "Baney was already a patient of [the hospital] at the time of his emergency medical condition and he simply cannot be considered as going to [the hospital] for purposes of EMTALA"). As with the plaintiff in Baney, even if Gilmore "suffered from a serious medical condition that was at risk to become emergent when he presented at [Geisinger] . . . EMTALA did not cover him under the alleged facts in the complaint." See id. Although not bound by the decision in Baney, the Court finds the Baney court's reasoning and application of Torretti persuasive with respect to the facts asserted here, and consequently, concludes that EMTALA does not apply to Plaintiffs' case.[16]

---

[16] Contrary to the Third Circuit's precedential opinion in Torretti, Plaintiffs urge the Court to look to decisions outside the Third Circuit in which courts have declined to adopt the applicable CMS interpretation of the EMTALA provision. In their brief in opposition, Plaintiffs cite a multitude of decisions not binding on this Court that they claim are more instructive than Torretti, including: Moses v. Providence Hosp., 561 F.3d at 573; Lopez-Soto, 175 F.3d at 170; Miller v. Med. Ctr. of Sw. La., 22 F.3d 626 (5th Cir. 1994); Thornton v. Sw. Detroit Hosp., 895 F.2d 1131 (6th Cir. 1990); Reynolds, 861 F.Supp. at 214; and Smith v. Richmond Mem'l Hosp., 416 S.E.2d 689, 692 (Va. 1992). (Doc. No. 26 at 12-28.) Notably, despite Plaintiffs' reliance on Lopez-Soto for the proposition that the Court should disregard the CMS interpretation in light of EMTALA's plain language, the court in Torretti stated explicitly that the First Circuit in Lopez-Soto encountered an earlier version of the regulation, which was significant for purposes of its analysis. See Torretti, 580 F.3d at 175 n.11 (citing Lopez-Soto, 175 F.3d at 175) ("[Lopez-Soto] came before CMS's 2003 clarifying Regulation and Final Rule. We do not attempt to speculate at how the First Circuit . . . would view this question in light of the revised Regulation, but in the [c]ourt's analysis it noted that the EMTALA 'provisions create distinct obligations and apply to different classes of individuals.'"). In light of the Third Circuit's emphasis on the importance of looking to the operative rules and regulations when interpreting EMTALA, the Court rejects

The Court finds that Plaintiffs' complaint fails to state a claim pursuant to EMTALA upon which relief may be granted. In the absence of a basis for subject matter jurisdiction over Plaintiffs' remaining state law claims, Plaintiffs' complaint (Doc. No. 1), is dismissed.[17]

IV. **CONCLUSION**

Based upon the foregoing, the Court will grant Defendants' motion to dismiss Plaintiff's complaint in its entirety. (Doc. No. 17.) An appropriate Order follows.

---

Plaintiffs' attempt to circumvent binding authority within this Circuit in favor of non-binding case law interpreting the CMS regulations in a way that may now be moot.

[17] The Court will not permit Plaintiffs leave to amend their complaint, as the Court has already determined that Plaintiffs fail to state a claim under EMTALA, and the Court otherwise lacks subject matter jurisdiction over their remaining claims. Therefore, any effort to amend the EMTALA claim would be futile.